Spinning v. Spinning.

WILLIAM H. SPINNING, appellant,

v.

HARRIET SPINNING, respondent.

43 215
d57 99
d57 112
───────
43 215
66 144

A widow who remains in and holds and enjoys the mansion-house of her husband before her dower is assigned to her by the statute (*Rev. p. 320 § 2*), is not bound to pay taxes, interest on encumbrances, or for repairs. Otherwise as to water rates, which are personal charges.

On appeal from a decree advised by Vice-Chancellor Van Fleet, whose opinion is reported in *Spinning* v. *Spinning, 14 Stew. Eq. 427*.

Charles Spinning, late of the city of Newark, died May 11th, 1882, intestate, seized in fee of lots Nos. 31, 33 and 35 Franklin street, subject to a mortgage for $2,300, executed by him and his wife, in his lifetime, to the Newark Fire Insurance Company. There were three houses standing on the lots, two of frame and one of brick, occupied by him at the time of his death and since by his widow, the respondent, as a family residence. She has received the rents of the two frame houses and paid taxes, interest, water rates and other annual charges and expenses of the premises. The bill was filed by William H. Spinning, one of the children, for a partition of this real estate among the heirs-at-law, the seven children of the said Charles Spinning, deceased, and for an account of the rents, issues and profits. The only contention before the court of chancery was whether the respondent should be charged, in her accounting, with taxes, water rents, ordinary repairs of the mansion-house and a proportion of the interest on the mortgage. The court below having decreed that the widow was not chargeable with these items, the complainant appealed to this court.

*Mr. Franklin M. Olds*, for the appellant.

Charles Spinning, a resident of No. 33 Franklin street, in the city of Newark, died May 11th, 1882, intestate, seized in fee of Nos. 31, 33 and 35 Franklin street, which he had mortgaged in his lifetime to the Newark Fire Insurance Company for $2,300, his wife, the respondent, having joined in the mortgage. He died leaving this mortgage still on the property.

His place of residence, No. 33, is by far the best of the three houses, and has been occupied by his widow, the respondent, ever since his death, dower not having been assigned her. She has had general charge of the other two houses, and with the income therefrom has paid the annual charges against all three.

NOTE.—The cases showing when a widow in possession of lands before the assignment of her dower must pay the taxes assessed thereon are collected in *2 Scrib. on Dower (2d ed.) 63;* see, also, *Benagh* v. *Turrentine, 60 Ala. 557; Stowe* v. *Steele, 114 Ill. 382; Austell* v. *Swann, 74 Ga. 278; Griffin* v. *Regan, 79 Mo. 73; Holcombe* v. *Holcombe, 2 Stew. Eq. 600 note; Jonas* v. *Hunt, 13 Stew. Eq. 660.*—REP.

Spinning v. Spinning.

The bill was filed for a partition of this real estate among the heirs-at-law, the seven children of said Charles Spinning, and for an account of the rents, issues and profits.

The only contention before the court below was whether the respondent should be charged, while occupying the premises No. 33 Franklin street under her right of quarantine, with taxes, water rents and ordinary repairs of this house, and with a proportion of the interest on the mortgage.

The court below held that the respondent should not be charged with any of these, and from that portion of the decree which so adjudges the complainant appealed.

(a) Widow's quarantine in New Jersey is a life estate, determinable by her abandonment of the premises or by assignment of dower, and the widow, like other life tenants, must keep down the annual charges.

*First.* It is at least an estate in the land.

I. It differs radically from common law quarantine, which was a jealously regarded privilege, personally to tarry forty days, and perhaps have sustenance meanwhile.

(1) Definition of common law right.

This right was first given by chapter 7 of Magna Charta : "*Et maneat in domo mariti sui per quadrigenta dies post mortem mariti sui,*" &c.

As stated by Coke (*Co. Litt. 32 b*) : " It was a right to tarry in the chief house of her husband but by the space of fortie dayes after the death of her husband, within which time dower shall be assigned her, unless it was formerly assigned her, which term of fortie dayes is called Quarantine." See, also, *Bac. Abr. tit. "Dower and Jointure, B of Quarantine;" 9 Vin. Abr. tit. "Quarantine" pl. 1 A; 4 Kent Com. *62.*

(2) Its object was to give the widow a home and maintenance during the period of her extreme grief, and it therefore ceased at once if she married within the forty days.

" This is the privilege the law allows to women to continue in the capital messuage or mansion-house, or some other house whereof they are dowable, forty days after the husband's death, whereof the day of his death is counted one ; and during this

time there to be provided with all necessaries at the expense of the heir, and before the end thereof to have dower assigned.

"This privilege is confirmed by Magna Charta (chapter 7), and seems to be only in compliance with that decency and ceremony which custom has introduced upon so melancholy an occasion that widows, who are supposed to be in great affliction, may not be forced to appear abroad and to be put to shifts for their maintenance, and for which reason, if they marry within the forty days, the quarantine ceases, for they have provided for themselves, and their sorrowful condition is supposed to be at an end." *Bac. Abr. tit. "Dower and Jointure, B of Quarantine."* See, also, *2 Inst. 17.*

(3) The right jealously regarded.

As shown by the above citation, so jealously was the right regarded that the strictest rule of construction was adopted; and it was held that the day of her husband's death should be counted as one of the forty days. See, also, *2 Scrib. on Dower ch. 3 p. 54 § 1.*

And at the end of the forty, or in reality thirty-nine, days, quarantine ceased, even if dower had not meanwhile been assigned, and the heir could then oust her by ejectment.

"Forty days next after the death of the husband, and no longer, the law allows the widow her quarantine, namely, to live in her husband's house and to be sustained with victuals there. By all the judges." *Jenkyn's Century p. 284 case 16.* Cites *Co. Litt. 32 b.*

"Widow for forty days after the death of her baron is by the law allowed her quarantine to live in the house of her baron, and to be sustained with victuals there, and not for any longer time."

"If she marries within the forty days, she loses her quarantine." *9 Vin. Abr. tit. "Quarantine" pl. 1 A p. 273.* Cites *2 Inst. 17;* see, also, *4 Kent's Com. *62; Doe v. Nutt, 2 C. & P. 436; Corey v. People, 45 Barb. 262; 2 Scrib. on Dower ch. 3 § 21; Jackson v. O'Donaghy, 7 Johns. 247.*

Could take crops only as part assignment of dower. *Budd v. Hiler, 3 Dutch. 45.*

*Den v. Dodd, 1 Hal. 367,* is wrong in stating that at common

law the widow could remain beyond the forty days and until dower was assigned her.

The case cited as authority (*Goodtitle* v. *Newman, 3 Wils. 176*), does not, however, sustain this position. The *dictum* of Justice Gould, quoted in Halsted, was afterwards retracted, and the decision of the court was put upon grounds entirely at variance with this first position of Justice Gould.

Chancellor Kent, *4 Com. *62*, says that this position, in *Den* v. *Dodd*, "is opposed to the decided weight of all English and American authorities," but approves of it on the ground of our statute; he evidently, though erroneously, supposing that our statute had been passed prior to the decision.

*2 Scrib. on Dower ch. 3 § 21*, in alluding to *Goodtitle* v. *Newman*, says:

"But this *dictum* is opposed to the clear weight of authority, and Lord Chief-Justice DeGrey, in subsequently delivering the opinion of the whole court, placed the decision upon grounds entirely at variance with the hastily expressed opinion of Mr. Justice Gould."

So, in *Evans* v. *Webb, 1 Yeates 424:* "The words of Mr. Justice Gould, in *3 Wilson*, have been relied on. These were his expressions on the first opening of the case, but however humane the sentiment was, we find he afterwards relinquished the position as untenable, for Lord Chief-Justice DeGrey, in delivering the sentiment of the whole court, says: 'If the mother had entered for her dower when it was not assigned to her it would have been a disseizin.' And the very ground of the plaintiff's recovering as heir-at-law of the infant son was that the possession of the mother and daughters was the possession of the daughters, and when the son was born the estate was divested out of the daughters, and not before; then the son was in absolute possession and seizin of the premises by his mother, who had a right to the possession, being his guardian by law, though not seizin as such."

In *Jackson* v. *O'Donaghy, 7 Johns. 247*, the court, per Justice Van Ness, say: "The privilege of a widow to tarry in the chief house of her husband for forty days, or until dower be

Spinning *v.* Spinning.

assigned her, does not protect her from an action of ejectment by the heir or any person deriving title from him after the forty days have elapsed. There is some difference between the words of our statute and Magna Charta. In the former the expression is that 'the widow shall tarry forty days or until,' and the latter ' within which time.'

" It is supposed that under our statute the widow has a right to quarantine until her dower be assigned. If this had been the intention of the legislature, then a limitation of it to forty days would be useless. The construction of our statute and Magna Charta must be the same, and that of the latter appears to be well settled. After the expiration of forty days the heir can expel her and put her to a suit. *Co. Litt. 34 b.*

" In a case reported in *Jenkyn's Century 184 case 16,* it was ruled by all the judges that a widow may live in the chief house of her husband forty days and no longer. The true construction of our statute and the provision of the Magna Charta appears to be that the widow shall enjoy her quarantine for forty days, unless, within that time, dower be assigned. The only instance which has fallen under my observation in which this construction of Magna Charta has been questioned is a *dictum* of Justice Gould, in the case of *Goodtitle* v. *Newman, 3 Wils. 519,* where he said that ' a court would not turn her out until her dower was assigned,' but he was undoubtedly mistaken."

As to the common law right being for more than forty days, *Den* v. *Dodd* is therefore clearly wrong. (*a*)

II. The estate granted by our New Jersey act—

(1) Is not merely a right to " tarry " for forty days, but to " remain in, and to hold and enjoy." See *Rev. p. 320 § 2,* first used in Paterson's dower act, January 31st, 1799.

(2) Is not for a limited time, but until dower be assigned.

The heir cannot put her out, and put her to her suit for dower, but she can occupy until he takes steps to assign dower. ·

(3) Her estate continues notwithstanding her remarriage.

(4) It is a right to live on the land and to enjoy its rents,

(*a*) Note.—*Den* v. *Dodd* was approved on this very point in *Smallwood* v. *Bilderback, 1 Harr. 506.*—Rep.

issues and profits, and to have the produce as crops. *Laird* v. *Wilson, Pen. 281 ; Merchant's Case, 12 Stew. Eq. 506.*

(5) It is a right, not only for the widow to live on the land herself, but she can rent to another and receive the rents herself. *Craige* v. *Morris, 10 C. E. Gr. 467.*

(6) It is such a right as enables her to maintain trespass. *Rogers* v. *Potter, 3 Vr. 78.*

(7) Its object is not simply to provide a temporary home for the widow during a short period of her extreme grief, but to provide for her until the heir does his legal duty by taking the legal steps to assign her her dower. *McLaughlin* v. *McLaughlin, 7 C. E. Gr. 569.*

(8) The words " and to hold and enjoy," added by Judge Paterson, in our act, to the " *maneat* " or " tarrie " of Magna Charta, show conclusively that something more was intended than merely to enlarge the time of common law quarantine.

The addition of these words could have had but one object, and that to change the mere personal privilege of the common law to a substantial estate in the land.

(9) Lord Mansfield, as counsel in the case of *Fountain* v. *Pellitt, 1 Ves. Jr. 339,* says of similar words : " ' To have, hold, use, occupy and enjoy,' are the very words of a legal estate for life."

(10) It is true that the cases in New Jersey sometimes speak of this right as a privilege, as did the vice-chancellor in the case of *Bleecker* v. *Hennion, 8 C. E. Gr. 123,* but, while so speaking of it, none of these cases say that it is not an estate. In fact the only inference from all of them is that it is an estate ; and it is so expressly styled in *Ackerman* v. *Shelp, 3 Hal. 129* and *Budd* v. *Hiler, 3 Dutch. 43, 53,* and by Chancellor Runyon in *Craige* v. *Morris, 10 C. E. Gr. 467 ; Colgan* v. *Pellens, 19 Vr. 27, 32.*

The case of *Bleecker* v. *Hennion* only holds that it is not such a particular estate as under the act of 1858 (*Rev. p. 802 § 30*), ·requires a consent before a partition can be made ; but that it is a part of the dower estate, and ` is, therefore, so far as partition is concerned, controlled by the act of 1855. *Rev. p. 1046 § 18.*

But the court distinctly recognizes it as an estate.

So, in *Smallwood* v. *Bilderback, 1 Harr. 497*, it is held that, if a widow voluntarily gives up her quarantine by leaving the mansion-house, she cannot re-enter ; but it by no means follows from this that her right is not an estate.

Quarantine is therefore an estate liable to be defeated either by assignment of dower or by voluntary surrender.

*Second.* Quarantine in New Jersey is not an estate at will.

It differs from it in the three points which chiefly characterize an estate at will.

I. It arises by operation of law and not by lease, by contract or by act of the parties.

An estate at will always arises by mere contract. *Littleton's Tenures b. I. c. 8 § 68 ; 1 Black. Com. *145 ; 1 Washb. on Real Prop. *370 ; Challis on Real Prop. *46.*

II. Tenancy at will confers no right or interest that is assignable. *Wms. on Real Prop. *339 ; 1 Washb. on Real Prop. *370.*

III. Tenancy at will is determinable at will of either party ; quarantine at will of the widow only, or by legal assignment of dower.

*Third.* Quarantine being therefore an estate, and not an estate at will, it can only be an estate for life.

I. Consider the ordinary classification of legal estates.

Quarantine is not, of course, an estate in fee for years, or at sufferance ; and, not being an estate at will, it must be classed as a life estate, as shown below.

II. Quarantine is "an estate for some uncertain period which may by possibility last for life." *Prof. T. W. Dwight's MS. Lectures.*

It belongs, therefore, to a well recognized branch of life estates, and comes within the definition given by all elementary writers.

As said by Coke in *Co. Litt. 41 B, 42 A :* "If a man grant an estate to a woman *dum sola fuit,* or *durante viduitate,* or *quamdiu se bene gesserit,* or to a man and woman during coverture, or as long as the grantee dwell in such a house, or so long as he pay xl. &c., or until the grantee be promoted to a benefice, or for

Spinning *v.* Spinning.

any like uncertain time, which time, as Bracton saith, is *tempus indeterminatum*—in all these cases, if it be of lands and tenements, the lessee hath, in the judgment of the law, an estate for life determinable if livery be made ; and if it be of rents, advowsons, or any other thing that lie in grant, he hath a like estate for life by the delivery of the deed, and in count or pleading he shall allege the lease and conclude that by force thereof he was seized generally for the term of his life."

" There are now some estates which may not even last a lifetime, but are yet considered in law as life estates, and are estates of freehold." *Wms. on Real Prop.* § *22.*

" This is rather a class of estates and embraces all freeholds which are not of inheritance, including estates held by the tenant for the term of his own life or for the life or lives of one or more other persons, or for an indefinite period, which may endure for the life or lives of persons in being, and not beyond the period of a life." *1 Washb. on Real Prop. (4th ed.) book I. ch. 5 p. 114* § 1.

" These may be created by the act of some party, as by a deed or devise, or by act of the law, as in case of dower and curtesy, as being incident to relations like that of marriage, which are created by law." *Id. p. 115.*

" It matters not how contingent or uncertain the duration of the estate may be, or how probable is its determination in a limited number of years; if it is capable of enduring for the term of a life, it is within the category of estates for life." *Id. p. 116.*

Again : " A man may have an estate for the term of life determinable at will ; as if the king doth grant an office to one at will and grant a rent to him for the exercise of his office for the term of his life. This is determinable upon the termination of the office." *Co. Litt. p. 142 A.*

III. Precedents support the view that such is a life estate.

(1) Precedents in other states :

*Roseboom* v. *Van Vechten, 5 Den. 409, 424.* By the court: " Under the will of Jacob Roseboom, his widow acquired an estate during widowhood in this lot of land. That was an estate

for life, determinable on her ceasing to be such widow, and during its continuance was a freehold."

So, in Massachusetts, the court held that the estate given by the homestead exemption act (which is the same as under our homestead act, *Rev. p. 1055*) is a life estate. *Kerley* v. *Kerley, 13 Allen 286.* "A right of homestead is a new species of estate created by statute and not known to the common law. But it seems to have all the incidents of a freehold estate, and to come within the definition given by elementary writers. It is an estate indeterminate in its duration, and which may continue for the joint lives of the purchaser and his wife. That it is defeasible, does not change the quality of the estate while it continues." See, on the same point and same ruling, *Silloway* v. *Brown, 12 Allen 30.* See, also, *1 Washb. Real Prop. b. I. ch. 7 § 2.*

(2) Precedents in New Jersey.

*Ackerman* v. *Shelp, 3 Hal. 125,* where the court, per Justice Ford, says that quarantine, under our statute, is "a freehold for life unless sooner defeated by act of the heir."

*Budd* v. *Hiler, 3 Dutch. 43–53,* where the court, per Justice Elmer, says of quarantine: "It is an estate for life, subject to be determined by her own act in quitting the possession, or by the assignment of her dower."

And Chancellor Runyon, in *Craige* v. *Morris, 10 C. E. Gr. 467,* approves this view, and says: "The estate thus given to her is not a common law quarantine of forty days, but a freehold for life, unless sooner defeated by act of the heir."

See, also, *Thomas* v. *Thomas, 2 C. E. Gr. 356,* where it was held that "a right given by will to occupy at a specified rent certain premises as long as the devisee may desire to occupy the same as a drug store, amounts to an estate for life."

Chief-Justice Beasley, sitting as master, says (*p. 359*): "The counsel for the defendant Lemuel Thomas, further insisted, on the argument, that the interest of Mr. Stanford in the mortgaged lands must be held liable, proportionally, for payment of the complainant's demand. There appears to be no room for doubt on this point. The will gives this defendant the right to enjoy a part of the mortgaged property, paying a rent, the maximum

of which is designated, as long as he may desire to use it as a drug store. This gives Mr. Stanford a freehold interest in the premises; his estate is deemed in law one for life." See, also, *Colgan* v. *Pellens, 19 Vr. 27, 32 ; 4 Kent's Com. *62.*

Quarantine, indeed, appears to be a *de novo* estate for life, created by our statute of 1799.

Thus Challis (*R. P. No. 52*) says : " To these [certain derivative estates] must be added certain cases in which it would seem that by force of an express statute, an estate is truly created *de novo*, being made to arise in one person under circumstances which are inconsistent with the hypothesis that it arises by derivation out of an existing estate, or by the transfer of an existing estate from one owner to another."

(*b*) But whatever may be the nature of the estate of quarantine, its tenant is at any rate subject to the maxim *"Qui sentit commodum sentire debet et onus."*

*First.* The maxim applies, of course, to life tenants of real estate.

Indeed, the principle of this maxim furnishes the ground of the rule that life tenants must keep down annual charges.

It applies also to life tenants of a fund.

" To require the life tenant to pay the annual tax assessed upon the fund is in accordance with the maxim '*Qui sentit commodum sentire debet et onus.*' The reason for requiring of a life tenant of land the payment of the taxes applies with equal force to the life tenant of a fund." *Holcombe* v. *Holcombe, 12 C. E. Gr. 473, 474 ; S. C. on appeal, 2 Stew. Eq. 597, 602.*

It applies to a life interest in a fund even when such interest is defeasible.

*Jones* v. *Dawson, 19 Ala. 672, 679.* The bill alleged that Dawson and wife, by ante-nuptial agreement, conveyed property to trustees for the joint use and benefit of the husband and wife during their joint life, with remainder to issue of marriage. The property, however, was not to be subject to the husband's debts, and if any of his creditors attempted to subject it to the satisfaction of debts, his interest was to cease immediately. The bill

sought to recover expenses of overseeing the land &c. and support of his slaves.

By the court: "The funds or property against which this bill is aimed is distinctly averred to be the *corpus* of the estate. Mr. and Mrs. Dawson have a joint estate for life; his interest, however, to cease when his creditors attempt to subject his property for the payment of his debts. The expenses here sought to be charged upon the fund were incurred in the management and enjoyment of the property pending the life estate, and evidently for the benefit of the *cestui que trust* for life. It is well settled, in such cases, that the *cestuis que trustent* for life, who are in possession of the trust estate, are liable for all current expenses attending the enjoyment of the property, and that such expenses constitute no charge upon the general fund or *corpus* of the trust."

*Second.* This maxim is not confined to life interests, but is applied, generally, to those possessing and enjoying property where future estates and interests are to be protected.

*Amesbury* v. *Brown, 1 Ves. Sen. 480,* Chancellor Hardwicke: "In general, a court of equity endeavors to make every part of the ownership of an estate bear part of the encumbrances; as, if there is a tenant for years or life, subject to a mortgage, he must keep down the interest during that time."

"This rule compelling a tenant for life to discharge the interest on mortgages and other real encumbrances applies as well to tenants for years, in dower, by the curtesy, as to all other kinds of tenants for life." *2 Scrib. on Dower 697 ch. 24 § 64.*

"Real property is a leading object in the consideration of this maxim, it being a common rule that all land, in passing from one owner to another, takes with it the burdens which the previous owners have put upon it, and the conditions to which it was, in passing from their hands, subject" &c. *Wharton's Maxims 175.*

Again: "The burden of repairs has, we may observe, always been thrown as much as possible, by the spirit of the common law, upon the occupier or tenant, not only in accordance with the principles contained in the above maxim, but also because it would be contrary to all justice that the expense of accumulated

dilapidations should, at the end of the period of tenancy, fall upon the landlord, when a small outlay of money on the part of the tenant in the first instance would have prevented any such expense becoming necessary; to which we may add that, generally, the tenant alone has the opportunity of observing, from time to time, when repairs become necessary." *Broom's Maxims *553*.

" If, moreover, a person accepts anything which he knows to be subject to a duty or charge, it is rational to conclude that he means to take such duty or charge upon himself, and the law may very well imply a promise to perform what he has so taken upon himself." *Broom's Maxims *556*.

*Third.* There is nothing in the nature of this quarantine interest which should exempt it from the operation of this maxim.

The law favors dower, but it does not favor it to the extent of subverting well-established principles, nor to the disregard of equitable considerations.

Thus, a doweress, after assignment, is subject to all the duties and liabilities of other life tenants. She must contribute her share of all annual charges, and also her equitable share of assessments for permanent improvements. See *2 Scrib. on Dower ch. 38 § 23 ; 1 Washb. Real Prop. 124 § 25 a ; Cairns v. Chabert, 3 Edw. Ch. 312 ; Plympton v. Boston Dispensary, 106 Mass. 544; Dey v. Codman, 12 Stew. Eq. 258.*

She is liable for waste committed. *Hallenbeck v. Cronkright, 8 C. E. Gr. 407 ; Brundage v. Goodfellow, 4 Hal. Ch. 513.*

On what theory should she be relieved from all these duties, while enjoying her right of quarantine—an incident, adjunct or appendage to her dower right?

(c) Construction of New Jersey act.

*First.* Its historical origin.

Anciently, widow liable to be called upon by heir to assist him in making up his relief; if heir a minor, the avarice of the lord or guardian would expect produce of land as soon as possible after death of tenant.

Later the relief changed, especially in *socage tenure*, to annual quit-rents, which the heir must keep up. If a minor, his

guardian (after 1676 in New Jersey) was bound to account for
the rents and income of minor's lands. So, of course, a widow
occupying homestead, after lapse of forty days, must at once
begin paying rent.

Legal contests between New Jersey proprietors and claimants
under Indian titles during last century; the Newark church title
troubles; the settlement of questions of forfeiture during and
after the Revolution; the publication of Blackstone, in 1765, all
tended to make the educated gentlemen of the end of last cen-
tury especially well versed in real estate questions, and all tended
to fix definite and exact notions, even among the common folk,
as to what was the meaning of the word "rent."

In this posture of affairs—

*Second.* Judge William Paterson prepared the "Act relative to
dower," passed January 31st, 1799. Volume 6 printed "Votes
and Proceedings of Assembly," January 17th, 18th, 28th, 29th
and 31st, 1799. Volume 4 printed " Journal of Council," Jan-
uary 17th, 19th, 23d, 24th and 28th, 1799.

Andrew Kirkpatrick, then a member of council, and William
Coxe, William S. Pennington and Henry Southard, members
of assembly.

Judge Paterson had been chancellor, and was then a United
States supreme court judge.

Paterson gives one uniform meaning to the word " rent "
throughout his laws. It is the legal and well-known meaning.

See the following acts: Landlord and tenant, *Pat. p. 163* §
*11;* Distresses, *Id. 173;* Reversioners entitled to benefits of
covenants of outstanding leases, *Id. 262;* Wrongful alienations
of land, *Id. 288* § *12;* Statute of frauds, *Id. 136* § *9;* Concern-
ing taxes, *Id. 408* § *32;* Limitations, *Id. 352* §§ *1, 6, 13.*

Griffith says of Paterson's publication (*4 Grif. Law Reg.
1154*): " It deserves particular consideration as containing a
complete incorporation of all such of the English statutes as
were supposed to be in force in 1776, with such others or parts
of others, previously or subsequently enacted, as he deemed fit
to introduce. It is supposed, so far as relates to a practical and
legislative substitution of English statutes in connection with

antecedent local laws and usages and the existing government, to be more complete in its execution than any former or subsequent attempt. Besides which, the antecedent domestic statutes were thoroughly revised and improved, and many parts of the common law altered and amended."

Justice Elmer, in his "Constitution and Government of New Jersey," published in volume 7 of New Jersey Historical Society Collections, at page 92, says of Paterson's Revision : "It may be safely said that when he completed the work assigned him and included all the public acts, entitled &c., he compiled a system of statute law more perfect than that of any other state."

Cortlandt Parker, Esq., in his address before the American Bar Association, on August 18th, 1880 (published in "New Jersey Law Journal" of January, 1881, page 11), says of Paterson : "Paterson, though an advocate and one of no mean ability, was especially a legal student and scholar. His forte was learning and exactness."

And again, on page 12, in speaking of his work in the federal congress : "And then as one of the committee on the judiciary, * * * he helped to frame the judiciary act, still, without much important change, the scheme of practice in the courts of the Union. Every lawyer appreciates the nicety, precision and wisdom needed for the task."

In a note on page 12 of Mr. Parker's address, it is stated "that Judge Dillon, in his useful work on 'Removal of Causes,' speaks of the judiciary act 'as one of the most remarkable instances of wise, sagacious, thoroughly considered legislative enactments in the history of the law.'"

Will it be lightly presumed that a man of such experience, such learning and of so accurate and precise habit of mind, used the word "rent" in the dower act so as to include taxes and repairs ?

*Third.* Common definitions of rent.

"Rents," in Latin, "*redditus;*" by some, *dicitur a redeundo quia retroit et quotaimus redit.* And others say it is derived of *reddere,* for that the rent is reserved out of the profits of the

land, and is not due until the tenant or lessee takes the profits."
*Co. Litt. 141 B.*

" The word ' rent' or ' render' (*reditus*) signifies a compensation or return, it being in the nature of an acknowledgment given for the possession of some corporeal inheritance. It is defined to be a certain profit issuing yearly out of lands and tenements corporeal." *Blackstone b. II. *41 (1765).*

Taxes and repairs cannot be certain.

The ordinary meaning of the word and its legal definition are the same.

Sheridan's dictionary, published in London, 1789, defines it as follows : " Rent—revenue, annual payments ; money paid for anything held of another."

Walker, 1791 and 1806 : " Rent—revenue, annual payment ; money paid for anything held of another."

Webster, 1828 : "Rent—a sum of money, or a certain amount of other valuable thing issuing yearly from lands or tenements ; a compensation " &c., as next below.

Webster, 1864 : " Rent—a certain periodical profit in money, provisions, chattels or labor, issuing out of lands and tenements in retribution for the use ; a compensation or return in the nature of an acknowledgment for the possession of a corporeal inheritance."

Worcester, 1878 : " Rent—a certain profit in money, provisions, chattels or labor, issuing out of lands and tenements in return for the use.; income ; revenue."

*Fourth.* A significant and controlling fact in the construction of the word " rent " in section 2 of our dower act is found in what is now section 24 of the same statute. *Rev. p. 324.*

This section was first enacted by the " Supplement to the act relative to dower," passed February 24th, 1820, and is section 10 of that act. See *R. L. 1820 pp. 677–679.*

That supplement was prepared by William S. Pennington, Esq., the same man that sat in the assembly in 1799, and assisted in passing Paterson's original dower act.

The statutes are *in pari materia.* The meaning of the word in the supplement is manifestly its ordinary and restricted meaning.

*Fifth.* In other states where the statute is the same as ours, the word "rent" has been construed to mean "rent" merely.

In Illinois, where the statute is the same as ours, the court say, in *Strawn* v. *Strawn, 50 Ill. 256, 258, 263,* that this provision is so clear as not to admit of construction, and that it means exemption from rent only and not from taxes. See, also, *Wheeler* v. *Dawson, 63 Ill. 54.*

In Kentucky, where the statute is the same as ours, it has been construed as in Illinois. *Burk* v. *Osborn, 9 B. Mon. 579.*

So in Alabama, where the statute reads "free from molestation or rent." *Shelton* v. *Carrol, 16 Ala. 148.*

In Ohio, Florida and Virginia, the statute reads "without charge," and hence the decisions in those states. *Conger* v. *Atwood, 28 Ohio St. 134, 138; Simmons* v. *Lyle, 32 Gratt. 752; 4 Kent's Com. *62 note; 2 Scrib. on Dower ch. 2 § 23, ch. 3 § 4.*

In Missouri it has been held that a widow shall not be required to pay taxes, but this is because of statutory provision that the administrator shall pay taxes. *Moore* v. *White, 61 Mo. 442.* And the case in North Carolina of *Branson* v. *Yancy, 1 Dev. Eq. 77,* was put on this same ground. In North Carolina the widow takes the entire personal estate until letters of administration are issued, and provision for a full year in any event.

In Rhode Island the statute is, till assignment &c. widow "may remain and continue in * * * without being liable to pay the heir any rent for the same." *Pub. Stat. R. I. 1882 p. 637 § 5.*

*Sixth.* Section 2 of the New Jersey act should be strictly construed. The following rules are applicable: Expression of one thing means the exclusion of other. The act alters the common law and is in derogation of the right of the heir, and according to *McLaughlin* v. *McLaughlin, 7 C. E. Gr. 509,* it is also in the nature of a penalty on the heir to compel him to assign dower.

(*d*) Inconsistencies and incongruities arising from construing this word "rent" in our statute so as to make it include all charges.

*First.* Such a construction would lead to this result: the widow need not pay interest on a mortgage, although she joined in it.

The statute gives her the right to remain in and hold and enjoy till her dower be assigned. The heir does not pay the interest, yet the mortgagee cannot eject her; and if he foreclose, the purchaser on foreclosure sale cannot enter until her quarantine cease. She can remain and take the produce, or collect the rents, and the mortgagee is powerless.

Again, under such a construction, she need not pay taxes. How, then, can the city or state sell the land so as to affect her right? If the construction of the act be as held by the court below, then the quarantine right is an estate far superior to dower. It is a right to hold and enjoy land free of all claims and demands whatsoever, and even the state itself cannot collect its revenue except subject to this right. Her signing a mortgage is then of no avail against this right. She bars her dower, to be sure, but can still enjoy her quarantine as fully as if she had not. Surely a construction which would lead to such results should not be put upon a statute when its plain, natural meaning by no means warrants it. If this be so only as between the widow and the heir, but her right is subject to encumbrancers' rights, it would follow that she could pay interest to save her possession, be subrogated to the mortgagee's rights as respects such interest, and bring suit to subject the property to the lien of her claim against the heir.

*Second.* Quarantine can only be had in estates of which the widow is dowable. So all the books agree. *2 Scrib. on Dower (2d ed.) 57 § 5 ; 1 Washb. on Real Prop. \*222 ; Morgan* v. *Titus, 2 Gr. Ch. 201, 204.*

In case of a mortgage in which a widow joins she has dower in the equity of redemption only. Can she then have quarantine in anything but such equity? The decree appealed from gives respondent quarantine in the entire estate.

*Third.* As to water rent or water tax. It would certainly seem that in equity the widow should pay this charge. She uses the water. In no way is the heir benefited. So far as he is concerned, the water could be shut off. And yet, by the decision of the court of chancery, she can use the water and compel the heir to pay for it, and thus so far furnish her maintenance during her quarantine. Though not so evident, the same reasoning applies

to all taxes. Ought the heir pay for the use his stepmother, perhaps, makes of the gas, fire and police protection, school facilities &c. furnished by the public authorities? To put annual charges on the heir is to construe her statutory exemption from rent as compelling payment of rent to her.

*Fourth.* The doctrine of the decree will tend to impair and destroy the inheritance of infant remaindermen by empowering widows to allow the annual charges to accumulate. Or, if they pay same and then receive credit therefor on partition after the lapse of years, the estate of the heir is likewise impaired. Or, if compelled to pay same to save their own rights, the doctrine of subrogation would, as said above, allow the property to be subjected to liens for the amount they had to pay.

*Fifth.* *2 Scrib. on Dower 62 § 10* lays it down that "the provision for quarantine relates only to the claim of the widow against the heirs or those claiming the estate under her deceased husband, and does not apply to strangers or persons claiming by adverse title. She is in no better condition to defend against an adverse or paramount title than her husband would have been." *Budd* v. *Hiler, 3 Dutch. 43* ; *2 Bl. Com. § 136.*

In Missouri, it was decided that tenant in quarantine of lands held by her husband in common cannot retain sole possession as against the deceased husband's co-tenant. "It was never intended that the widow should have her quarantine at the expense of those who are in no way connected with her." *Collins* v. *Warren, 29 Mo. 236,* cited in *2 Scrib. on Dower 57.*

(*e*) Construction contended for by appellant harmonizes all rules of law involved.

I. It assigns to quarantine its due position among legal estates.

It gives full scope to the maxim "*Qui sentit commodum*" etc.

It places owners of present and future estates on the same footing, whether of real or personal estate.

It ensures preservation and transmission of inheritance to the heirs.

Such a construction has regard to the historical origin of the act and its object.

It takes the word "rent" in its ordinary, legal and popular meaning.

The court needn't go out of its way to make occupancy without rent mean occupancy without charge.

Such a construction avoids all legal inconsistencies.

It is no hardship on widows. They can quit the homestead at any time, and at any time apply for assignment of dower.

II. The Illinois rule seems just. The opinion of the court below admits its equity.

"It appears that she [the widow], with her family, resided upon and had the use of the land from the time of the death of Hall [her first husband] until this suit was brought. She held it free of rent, as her dower was not assigned her. Being entitled to use and occupy the same without accounting for the profits and gains made from it, no one would say that she should not, in justice and equity, pay the taxes and keep the premises in repair. We are aware of no principle of law or equity that would impose the duty on the heirs to pay the taxes and keep up the repairs of the farm for the use of the widow, when she is in receipt of all the rents and profits. Nor had she the right, at the expense of the heirs, to erect the stable and clear the land. She simply had the legal right to hold the premises free from rent until her dower should be assigned her" &c. *Wheeler* v. *Dawson, 63 Ill. 54, 56.* See, also, *Strawn* v. *Strawn, 50 Ill. 256, 263.*

(*f*) Analyze opinion of court below and other New Jersey cases against appellant.

*Cronley* v. *Cronley, 13 Stew. Eq. 32,* cited in the opinion of the court below, says that a widow, while enjoying quarantine, is not liable to pay interest on a mortgage. The remark is, however, opposed to the opinion of the same chancellor in *Housten* v. *Housten, 12 Stew. Eq. 147.*

*Mr. S. H. Pennington, Jr.,* for respondent.

The issues in this case raise the question whether the respondent, the widow of Charles Spinning, deceased, and who, after his

death and without assignment to her of her dower, remained in the chief dwelling-house of her husband, according to law under the provisions of the statute of this state, was, during such occupancy, bound to keep down the interest on encumbrances, to pay ordinary taxes, and should be charged with the necessary repairs.

The insistment of the appellant, her son and one of the seven heirs-at-law of the decedent, that the respondent is so liable for annual charges on the mansion-house and premises would seem to rest upon the applicability to the present case of the rule embodied in the maxim that the person who derives the advantage ought to sustain the burden.

It is unquestioned that this rule applies to the case of every owner of a life estate, every tenant by the curtesy, every tenant in dower—that is to say, every widow after assignment to her of her dower, in respect of the land so set off to her.

The vice-chancellor, in his opinion in this case, aptly observes that other tenants, such as tenants for years, from year to year, and at will, are not, in the absence of a contract to that effect, subject to such burden. But, as there are some exceptions which detract from the universality of this principle (see *Willard* v. *Blount, 11 Ired. 624; Hughes* v. *Young, 5 Gill & Johns. 67*), and as such tenancies are usually founded on express contract reserving a fixed rent, it may be objected that it is the express contract which supersedes any such liability as might otherwise arise, *expressum facit cessare tacitum*, and that the contract would control and limit the duty of the tenant.

It would seem, therefore, that the non-liability of the respondent for annual charges during such occupancy of the mansion-house of her deceased husband may be more firmly and securely rested on the peculiar and somewhat anomalous nature of her right now under consideration.

The vice-chancellor, in his opinion, describes this right of the widow as a privilege in the nature of a tenancy at will, and probably such designation is sufficiently descriptive; but however it may be most accurately defined, it is clearly a legal right which equity will recognize and follow, and which, however·

agreeable with natural justice, is founded in the common law as recognized and extended by statute.

Before the Conquest, in England, we are told its duration was one entire year (*Co. Litt. 32 b*); by the Great Charter, it was limited to forty days, within which time dower must be assigned, whence its usual designation, "widow's quarantine."

By our statute it is provided " that until dower be assigned to her, it shall be lawful for her to remain in and to hold and enjoy the mansion-house of her husband and the messuage or plantation thereto belonging, without being liable to pay any rent for the same." *Rev. p. 320 § 2.*

It seems almost needless to remark that in attempting a construction of such a statutory provision, not creating a new right, but adopting and amplifying an ancient privilege of the widow under common law, regard must be had, not to the words of the act alone, but especially to the nature and incidents of the right as it previously existed, and as it continues to exist, except so far as clearly altered by the statute.

. The statute, moreover, does not appear to have been intended as an innovation.

In *Den* v. *Dodd*, *1 Hal. 367*, where it was held on common law that though the widow could not enter upon the land until dower had been assigned, yet, being in possession, she could not be ousted by the owner of the fee, unless her dower was assigned her. This case was so decided in the year 1797, and while Chancellor Kent refers to this decision as being against the decided weight of English and American authority (*4 Kent Com. *62*), yet, in 1799, two years later, the law was enacted substantially adopting the rule of this decision (see *Pat. 343*), and continues unaltered on our statute book to this day.

That the widow's quarantine is a mere personal privilege, incident to a right of dower unassigned, and not an estate in the land, sufficiently appears from the following considerations.

In *Smallwood* v. *Bilderback*, *1 Harr. 506* (per Ford, J.), it is said to be a privilege, personal to the widow herself, and if once she move out voluntarily and depart, it is gone forever, and her

dower is reduced to a naked right, only to be recovered by action at law.

In the language of the present chief-justice, speaking generally of the right of dower before assignment: "It is clear that she cannot, at this stage of her right, enter upon the estate or maintain ejectment, nor can her interest be seized on execution, nor can she transfer it at law, except by release to the terre-tenant by way of extinguishment." *Rogers* v. *Potter, 3 Vr. 78, 84.*

Notwithstanding, if she did not depart voluntarily, but was evicted by the heir or terre-tenant, she was, at common law, entitled to the writ *de quarantina habenda,* as given by Fitzherbert. *Nat. Brev. 162.*

. If her quarantine was properly an estate in land, the widow, being out of possession, should have at least a right of entry upon the premises, but this, it is clear, she does not have.

Again, in *McLaughlin* v. *McLaughlin, 7 C. E. Gr. 505,* in giving the opinion of this court, the chief-justice speaks of the right in question as a privilege, and of our statute as but an amplification of the provisions of Magna Charta, beneficially extending the term of the widow, and decides that occupancy under such right or privilege furnishes no counter claim or set-off to damages for detention of dower in other lands of her husband, and that to hold otherwise would be, in effect, to charge the widow with rent, and to expunge the statutory provision. See, also, *Bleecker* v. *Hennion, 8 C. E. Gr. 123,* opinion by Vice-Chancellor Dodd.

Quarantine, like unassigned dower, is not subject to levy and sale. *2 Scrib. on Dower 60, 61,* and citations.

It is true it has been held in this state that the widow may occupy by her tenant, as a mode of enjoying the use of the mansion-house, and such tenant, whatever the legal *status* of the widow, is, of course, estopped to question her right so to let the premises. *Craige* v. *Morris, 10 C. E. Gr. 467.*

And, for like reason, she may take in persons to board at her table, and to lodge in the house, so that she may have the full beneficial use of the premises, as claimed in her answer.

That she may occupy by her tenant is also held in Alabama. *Inge* v. *Murphy, 14 Ala. 289; Shelton* v. *Carrol, 16 Id. 148.*

But, notwithstanding, it is held in that state that the widow's right to occupy cannot be transferred to another, and, if she assume to make conveyance of her interest, the heir may recover in ejectment of the alienee. *Wallace* v. *Hull, 19 Ala. 367.* So in Kentucky: *Burk* v. *Osborn, 9 B. Mon. 579; Hyzer* v. *Stoker, 3 Id. 117.* So in Mississippi: *Wallis* v. *Smith, 2 Sm. & Marsh. 220.*

The incidental remark of Mr. Justice Ford in *Ackerman* v. *Shelp, 3 Hal. 125,* where he alludes to the widow's right under our statute as " a freehold for life, unless sooner defeated by the act of the heir," so far as it was of any importance at all in that case, would seem to have reference to the possible duration of the privilege and not to its nature or incidents, for the question there at issue was as to the sufficiency of a notice accompanying a plea of general issue, in an action of trespass *quare clausum fregit.* Now, in pleading quarantine, the widow must show with certainty the time when her husband died and the period of forty days after. *Kettillesby* v. *Kettillesby, Dyer 76 b; 1 Rop. on Husb. & Wife *387.* Hence, under the statute, all the widow, or her servant acting under her authority, could have been required to show, was the seizin of her husband, the fact of his death, and that she had since continued to occupy without assignment to her of her dower. This case of *Ackerman* v. *Shelp* is considered in the opinion of the vice-chancellor, and requires no further reference.

The widow, during such occupancy by her of the mansion-house, is in no legal sense a tenant.

She was not a tenant in the lifetime of her husband, though with her husband she was an occupant, and at and after his death she has the right to continue to occupy by virtue of the common law and the statute. But occupancy is not tenancy ; and while the phrase employed in the act is " remain in, hold and enjoy the mansion-house," it is clear the word " hold " cannot here be used in any technical sense, that is, to have an estate on condition of paying rent or performing service, or to be tenant to another,

because the statute provides that the widow shall hold without rent, nor does it define of whom she is to hold.

A dowress, after assignment of dower, does not hold as tenant under the heir who sets it out to her, but under her deceased husband, or rather by appointment of law, nor is there any privity of estate between the dowress and the reversioner of her lands. The freehold is vested in the dowress by virtue and in continuance of. her husband's seizin. It is only in respect of certain obsolete feudal relations that she is sometimes said to be *quasi* tenant under the heir. See a full discussion of this subject in *1 Washb. on Real Prop.* \*254 and the cases there cited.

Since, therefore, quarantine is but a right incident to dower unassigned, the widow, during her occupancy under this right, cannot be said to hold under or be tenant of the heir. The words of the statute referred to must then be but a paraphrase of the expression " remain in " (*maneat*) of Magna Charta, defining more fully the intent of the common law privilege so recognized and extended, and do not create a tenancy ; and the further words of the statute, "without being liable to pay any rent," properly speaking, cannot be a denial of rent to any supposed landlord out of her holding, but are only an equivalent to a provision that she shall not be liable in any wise in respect of her privilege, and shall occupy free of charge.

All general and undefined tenancies, as well such as are created by grant or contract as those which arise by implication, entitle the tenant to the usual notice to quit. See *Den* v. *Drake, 2 Gr. 521, 531*. The right of the widow being but a permissive right, terminable at the option of the heir, on his setting off to her her dower, it would border on the absurd to suggest that she is entitled to such notice to quit as in case of a tenancy of uncertain duration.

It cannot be urged, therefore, that the widow's right of occupancy is an estate or tenancy in any proper legal sense, so as to subject her to any liability of a tenant for life (or for years) in regard to annual charges on the land.

From these negative considerations we turn now to the more positive reasons for the widow's exemption from such duty.

The widow is entitled to be endowed immediately after her husband's death, and no prior demand by her is necessary to her right to have dower assigned to her, or to her claim of damages for its detention, and so pressing and compulsory is the obligation resting upon the heir that he cannot, in this state, plead *tout temps prist* to the claim of the demandant. *Hopper* v. *Hopper*, *2 Zab. 715, 724.*

Her right of occupancy before assignment of dower is, in law, therefore, most temporary and evanescent, being thus dependent upon the continuing wrong or neglect of the heir or reversioner. This consideration was entirely overlooked in *Wheeler* v. *Dawson*, *63 Ill. 54*, as observed by the vice-chancellor.

The widow, during her quarantine, is entitled, at common law, and as incident to the right in question, to be supported out of her husband's personal estate (*de bonis viri*). *1 Rop. on Husb. & Wife *388* and authorities cited; *1 Washb. on Real Prop. *222.* But see *Fitzherbert Nat. Brev. 162* (in margin), where it is denied that she is entitled to meat and drink, for it is said the statute does not extend to it, though it is queried whether she may not kill anything if there be not meat in the house. The right to support, at common law, does not appear to be otherwise limited or qualified. *2 Scrib. on Dower 51.*

The widow is also entitled to estovers for repair of buildings, fences and instruments of husbandry, and this right is not the same enjoyed by a dowress and every other life tenant, that is, the right to her reasonable estovers out of the particular land so held, but something more extensive—a right to common of estovers—*estoverium de communi*, in the words of the Great Charter (chapter 7)—that is, to be taken from off another's estate in common, or, as applied to the present matter, from the estate of her husband other than the part so occupied by her under right of quarantine. This distinction is clearly pointed out in *Chitty's note, 2 Bl. Com. *35*, where the two are shown to be essentially different. See, also, *Steph. Com. 10*.

If the husband die seized, and descent be cast upon the heir, the widow has her dower as of the value of the land at the time of assignment, and has the benefit of all improvements made by

the heir before assignment of dower.    *Humphrey* v. *Phinney, 2 Johns. 484; Catlin* v. *Ware, 9 Mass. 218; Parker* v. *Parker, 17 Pick. 236; Jac. Law Dic. tit. "Dower."*

And the fact that she has occupied the premises will make no difference.

In *Husted's Appeal, 34 Conn. 488,* where it was held that the widow was not estopped to claim full value of her dower by reason of the fact that the reversioner (her son, with whom she lived) tore down the old dwelling and erected a new house, with her approbation and for the more comfortable accommodation of his family, and of her as a member of it, and that she occupied it as a member of his family for several years before she applied to have her dower set out.

This last case, cited from Connecticut, exemplifies the persistence of common law rules, notwithstanding certain statutory changes, and the fact of it having been the law in that state from earliest times (by singular exception) that the widow, before assignment of her dower, is tenant in common with the heir of the lands of which the husband died seized.    *1 Swift's System 225 ; Stedman* v. *Fortune, 5 Conn. 462.*

As the widow cannot be charged with permanent improvements made by the heir, she cannot with consistency be charged with ordinary repairs.

The following cases may serve still further to illustrate the subject :

*Beers* v. *Strong, Kirby 19.*    This was in chancery, on petition against a widow to compel her to repair agreeably to the statute of that state, which provides " that every widow shall keep in repair the buildings, fences and lands set out to her for her dower " &c.    A certain tract and buildings were apportioned to the widow as dower, not in the mode prescribed by statute, but by a conveyance or deed of settlement of the parties in·interest, and the buildings had not been kept in tenantable repair.—*Held,* on demurrer, by the whole court, afterwards affirmed by the supreme court of errors, that the statutory provisions compelling a tenant in dower to repair extend only to dower assigned in the manner the statute requires ; that here was no dower, and the

widow, whatever she had in the land in question, took by purchase without other limitations or conditions than such as were specially provided in the grant or settlement. See *Stat.* (*6th ed.*) *1 c. 5 ; 1 Rop. on Husb. & Wife § 417 &c.*

If a statute compelling a dowress to repair in such case were necessary, and if a widow in the enjoyment of her life estate were thus jealously guarded from such liability, it may be fairly inferred that, in the absence of any such statute, and at common law, a widow, before her dower is set out to her, ought not to be so chargeable.

*Shirley* v. *Mutual Assurance Society, 2 Rob.* (*Va.*) *705.* . The husband died seized of property insured by the Mutual Assurance Society of Virginia, and his widow was by law entitled to dower therein subject to the lien of the society.—*Held*, she does not become personally liable for quotas and premiums until her dower is assigned to her ; then she becomes a member of the society, and liable only for such quotas and premiums as accrue while she is owner of the dower estate. But that before assignment of dower in such case and after the death of her husband, the heir, or in case of sale the purchaser, is responsible for quotas and premiums accruing during that time.

By the statute of Virginia, " until dower is assigned the widow is entitled to occupy and enjoy the mansion-house and curtilage without charge," *i. e.*, substantially as at common law, except in respect of the duration of the right so to occupy.

*Branson* v. *Yancy, 1 Dev. Eq: 77.*—*Held*, that a widow occupying the land of her husband with her children, the heirs-at-law, before the assignment of dower, is not a " tenant " or " proprietor " within the statute, and is not liable for the taxes; and a purchase by her at a sale for taxes, under the statute, will not be set aside in favor of creditors of her deceased husband.

*Hillgartner* v. *Gebhart, 25 Ohio St. 557*, is to the effect that before dower is assigned taxes should be deducted from the entire estate of the decedent.

Finally, to charge the respondent, a widow occupying the mansion-house of her deceased husband, personally on an accounting for taxes on the premises so occupied, would be without warrant

of law in this state; for taxes are levied on property (lands, chattels, effects and estates), and the widow, if the foregoing views be correct, has no estate in the land, but only a right to be supported thereon prior to the assignment of her dower.

To charge her for repairs would be to deny her right to common of estovers. So, also, as to insurance premiums; and the insurance in the present case confessedly was for the benefit of the estate of her deceased husband. Nor yet would it be lawful to charge the respondent for interest on the mortgage on the lands and estate of her husband. *Cronley* v. *Cronley, 13 Stew. Eq. 30.*

Moreover, a mortgage debt is a personal liability of the husband, and is a general charge on his estate, as has been held in a series of cases in this state. *Keen* v. *Munn, 1 C. E. Gr. 398; McLenahan* v. *McLenahan, 3 Id. 101; Campbell* v. *Campbell, 3 Stew. Eq. 415.*

But the case shows that the husband did not leave any personal assets to satisfy either principal or interest on the mortgage, so that resort must be had, in the next place, to the heirs-at-law, who, subject to the widow's right of dower unassigned, succeeded to their father's legal title and estate, and in respect thereof became the debtors to the mortgagee.

And as these several items of annual expense—interest, insurance, repairs, taxes—are properly chargeable upon the *fructus* of the estate, they would seem rightly to have been paid out of the rent of the houses let to tenants for the benefit of the entire property, and in relief of the part lawfully occupied by the respondent under the terms of the statute.

The opinion of the court was delivered by

SCUDDER, J.

The single question presented for our determination is whether the respondent, in stating her account of rents received, and expenditures for the three houses, shall be credited with the taxes, proportion of interest and repairs of the dwelling-house occupied by her since the death of her husband. As widow, she is entitled to dower in all of these lands, of which her husband

died seized, and the value of that dower right will be paid to her from the proceeds of the sale of the premises in these proceedings. But, as her dower was not assigned to her, it was, by the statute, lawful for her to remain in and to hold and enjoy the mansion-house of her husband, without being liable to pay any rent for the same, until such dower be assigned to her.

The derivation of this statute from the widow's quarantine, by the law of England, has been recognized in every construction and application that has been given to it and like statutes. It is important to notice this historic derivation of our law in determining the kind of interest which the widow has in the mansion-house of her husband before the assignment of her dower. As, at the death of the ancestor, the descent of land was cast on his heir, it was needful that some immediate provision should be made for his widow's shelter and support before her dower was assigned. *Co. Litt. 32*, says: "Some have said that by the ancient law of England the woman should continue a whole year in her husband's house, within which time, if dower were not assigned, she might recover it, and this was certainly the law of England before the Conquest. By the statute of Magna Charta (chapter 7) she shall tarry in the chief house of her husband but by the space of forty days after the death of her husband, within which time the dower shall be assigned unto her." See *Bac. Abr. tit. "Dower" (b)*; *Jac. Law Dic. "Quarantine;" 4 Kent Com. 61; 2 Scrib. on Dower 49; 1 Washb. on Real Prop. 186, 189, 271, 272.*

This provision of quarantine for the widow in her emergency was carefully distinguished from her right of dower before it was assigned to her, and when the assignment had been made her estate in dower related to the date of her husband's death, as a continuance of his estate in the lands. The widow's quarantine is called, in the books above cited, "a privilege," "a benefit," "a right," but not a freehold estate in land. The interest given to her was temporary and fugitive in its purpose, and not designed for continuance beyond a brief time, and as a means of constraining the heir to assign her dower without unreasonable delay. But it is said that our statute, passed January

31st, 1779, drawn by Mr. Paterson, a most active and thorough lawyer, manifests a different intention, and confers on the widow a higher title in the mansion-house of her husband than a mere quarantine right. This is shown, it is claimed, by the change of time from the exact term of forty days to the indefinite period " until such dower be assigned to her," and by the addition of the words " to hold and enjoy " to the word " *maneat*" (to remain in), found in the original charter or law. But as by the old law the widow was required to quit the possession of the chief house if her dower was not assigned in forty days, and there was a question whether she was entitled during quarantine to have her reasonable estovers and subsistence out of the estate, as appears in *Co. on Litt. 32*, it may well be said that the change in the statute was to make a more liberal and certain allowance for her comfort and support without altering the nature of her interest. In addition to the mere right of remaining in the mansion-house and messuage or plantation thereto belonging, she was also given, by our statute, the greater benefit of holding and enjoying the premises and the profits without payment of rent to the heir and until her dower was assigned her. This was intended to be a more generous extension of her privilege of quarantine. It is also noticeable that in 1797, two years before the passage of our statute, the right of the heir to dispossess the widow by ejectment before dower was assigned had been discussed in *Den* v. *Dodd, 1 Hal. 367*. This statute, following so soon after this case, confirmed her possession in the homestead until the assignment of dower, and made that certain which before was considered doubtful. As this law gives the possession and profits of lands for an uncertain period, which may continue for the life of the widow, it is argued that it confers an estate for life; and if an estate for life is granted, then the widow, like other tenants of life estates, must pay taxes, keep down encumbrances, and make reasonable repairs until the term be ended. There are cases in our own courts which give countenance to this inference by expressions used descriptive of this act. *Ackerman* v. *Shelp, 3 Hal. 125; Budd* v. *Hiler, 3 Dutch. 43; Craige* v. *Morris, 10 C. E. Gr. 467*. It cannot be denied

that, as thus defined, the right of the widow under our statute has some of the incidents of a freehold estate for life; but it is equally certain that it has also some features of an estate at will, though it arises by operation of law, and not by lease, by contract or by the act of the parties, for it may be ended at any time by the release of her dower by the widow, or at the will of either party by application to the orphans court for the assignment of dower (*Rev. p. 323 § 17*), or by the act of the heir or devisee in making such assignment, or she may give up the possession voluntarily at any time and thereby end her quarantine, as in *Smallwood* v. *Bilderback, 1 Harr. 497–506*.

It is difficult and often misleading to attempt to define statutory rights by terms of the law applicable to other conditions and conformed to rules of the common law, and some confusion has been caused in thus attempting to construe this statute and like statutes in other states. It is better to make the statute its own interpreter, and to construe it according to the ordinary rules of construction. The vice-chancellor, in his opinion in this case, says that the right given to the widow under our statute is not a life estate, but may be accurately described as a privilege in the nature of a tenancy at will. In *McLaughlin* v. *McLaughlin, 7 C. E. Gr. 505, 510*, the chief-justice says that "it is but an amplification of the provision of Magna Charta, beneficially extending the term of the widow and expressly declaring that she shall hold the premises free of rent." Vice-Chancellor Dodd, in *Bleecker* v. *Hennion, 8 C. E. Gr. 123, 125*, says: "The widow's possession or quarantine is an incident only to her dower, belonging to that right and inseparable from it. It is a privilege preceding but in no wise preventing or impeding the assignment or disposal of dower." In neither case is an attempt made to define the act by any terms known in the law, but to construe and apply its words according to their evident intention to the facts in hand. Was it then the intention of the legislature, as expressed in this act, that the widow, during her possession, before the assignment of dower, should pay taxes, keep down encumbrances and make repairs of the house of her husband? The statute puts no such burden upon her; it says she is not liable

to pay any rent ; the old law gave her a quarantine without charge, and if her home be all that is left to her, to pay taxes, keep down encumbrances and make repairs during her uncertain term, might be a loss instead of a benefit to her and thwart the very purpose of the act. If her possession be continued for years, as in this case, and is profitable to her, such is not the design of the act, and it should be left to some arrangement with the heir or devisee, who has it in his power, at any time, to assign her dower, or to further legislation. In *Cronley* v. *Cronley, 13 Stew. Eq. 30,* the chancellor held that the possession of the widow, under this statute, did not devolve on her the duty of paying the interest upon a mortgage, and this judgment is now approved as a proper construction of the statute which does not burden her with the discharge of liens on the land while she has but a temporary possession awaiting the assignment of her dower. The case of *Houston* v. *Houston, 12 Stew. Eq. 146,* is distinguishable, as continued possession was not held by the widow. *Holcombe* v. *Holcombe, 12 C. E. Gr. 473, S. C., 2 Stew. Eq. 597,* requiring the life tenant of a fund in the hands of executors to pay the annual taxes assessed thereon, is applicable to a tenant for life of land, and therefore to a tenant in dower, but · does not control the present case, where the dower has never been assigned. The different views that have been taken by courts of other states having like statutes, have been examined, and may be seen by reference to *Strawn* v. *Strawn, 50 Ill. 256; Wheeler* v. *Dawson, 63 Ill. 54; Burk* v. *Osborn, 9 B. Mon. 579; Shelton* v. *Carrol, 16 Ala. 148; Conger* v. *Atwood, 28 Ohio St. 137; Moore* v. *White, 61 Mo. 442; Branson* v. *Yancy, 1 Dev. Eq. 77; Simmes* v. *Lyle, 32 Gratt. 752.* The last-named case, decided in 1880, has a very able and instructive opinion of the court, reaching substantially the same conclusion which has been above expressed.

The maxim "*Qui sentit commodum sentire debet et onus,*" which has been sometimes quoted in this connection, is not applicable to cases which are regulated by statute law, and has therefore no efficiency in the present case, where the widow's right is purely statutory and limited.

What has been said has reference to taxes, mortgage interest and repairs, which are clearly liens and charges on the real estate; the water rates are part of the personal expenses of the occupant of the mansion-house and should be charged against her; but as the case does not show that any water rates are due or are made on account of this house occupied by the widow, separate from the others, the decree should not, for this cause, be changed.

The decree will be affirmed, with costs.

*Decree unanimously affirmed.*